IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-633

No. COA22-191

Filed 20 September 2022

Disciplinary Hearing Commission, No. 21 DHC 5

THE NORTH CAROLINA STATE BAR, Plaintiff,

v.

LONNIE P. MERRITT, Defendant.

Appeal by defendant from order entered 21 September 2021 by the Disciplinary Hearing Commission. Heard in the Court of Appeals 23 August 2022.

*The North Carolina State Bar, by Deputy Counsel David R. Johnson, for Plaintiff-Appellee.*

*Narain Legal PLLC, by Lucky Narain, for Defendant-Appellant.*

CARPENTER, Judge.

¶ 1        Lonnie P. Merritt ("Defendant") appeals from an order of discipline (the "Order") entered by the Disciplinary Hearing Commission (the "DHC") of the North Carolina State Bar (the "State Bar"), concluding he attempted to engage in sexual relations with his current client, C.T., and did engage in sexual relations with C.T. while she was a current client, in violation of the North Carolina Rules of Professional Conduct (the "Rules"). The Order suspended Defendant's license to practice law for one year. After careful review, we affirm the Order.

## I.     Factual & Procedural Background

This is an attorney discipline case arising from a complaint filed by the State Bar alleging Defendant had an extramarital affair with his current client, C.T.

Defendant was admitted to the State Bar in August 2008.  Defendant lived with his wife in Wilmington, North Carolina, where he practiced law.  C.T. initially contacted Defendant in December 2017 to discuss marital separation and divorce.  In March 2018, C.T. contacted Defendant again after receiving a proposed court filing from her spouse related to their domestic dispute.  Defendant agreed to represent C.T. in the matter.

On 9 March 2018, C.T. and Defendant executed an agreement for C.T.'s representation, the Non-Litigation Client Agreement (the "Initial Agreement"). Pursuant to the Initial Agreement, the "Covered Services" included in the representation were, *inter alia*, drafting a consent order for equitable distribution, child custody, and child support.  The Initial Agreement also included "seeking an [a]bsolute [d]ivorce" as one of the Covered Services, if such service was requested by C.T.  Representation under the Initial Agreement "terminate[d] upon either: (1) the entry of an order with the court, or (2) when the Firm . . . provided Covered Services . . . or (3) [C.T.'s] fail[ure] to pay any fee that [became] due" under the agreement.

On 3 August 2018, C.T. and Defendant signed a second agreement, the Litigation Client Agreement (the "Second Agreement"), in which Defendant was to

represent C.T. in the matters of child custody and child support. The Second Agreement explicitly excluded the "[f]iling for absolute divorce" from the scope of representation. There was no language in the Second Agreement that superseded or nullified the Initial Agreement.

¶ 6        On Saturday, 4 August 2018, Defendant met C.T. after business hours at the health clinic where she worked and where he was not a client, following C.T.'s invitation. C.T. performed an ultrasound of Defendant's heart at no charge and without authorization of the clinic. For the procedure, Defendant removed his shirt at C.T.'s direction. As Defendant parted ways with C.T. at the end of the visit, Defendant advised C.T. that he and her husband's attorney had negotiated a consent order (the "Consent Order"), and it was ready to be signed.

¶ 7        Later that day, Defendant met C.T. at her house to execute the Consent Order, although Defendant never met clients at his own house and normally met clients at a coffee shop or an office space of a colleague. After C.T. and Defendant signed the Consent Order, Defendant sat on the couch with C.T. Defendant "perceived a mutual attraction at the [health] clinic" and "again at [C.T.'s] house." Defendant asked C.T. if he could kiss her, and she consented. The two "made out" on the couch, and Defendant moved his hand under her dress, touching her leg. Defendant also "snapped [C.T.'s Spanx bodysuit undergarment] on her side," causing Defendant and C.T. to laugh. At some point, C.T. asked Defendant to stop. Thereafter, they spoke

but did not continue kissing, and Defendant went home. C.T. and Defendant had several "lengthy late-night phone calls," beginning that evening and through August 2018.

¶ 8    On 8 August 2018, the Consent Order was countersigned by C.T.'s husband and her husband's attorney. On 28 August 2018, the Consent Order was filed in the New Hanover County District Court and signed by a district court judge. The Consent Order allowed Defendant to withdraw as counsel for C.T., although there is no evidence in the record of Defendant doing so.

¶ 9    By mid-September, Defendant and C.T. began having sexual intercourse. On 24 September 2018, Defendant signed a divorce complaint on behalf of C.T. as the attorney of record, and the complaint was filed on 26 September 2018. Defendant filed a motion for summary judgment and represented C.T. at the hearing on the motion. On 2 November 2018, a divorce judgment was entered, granting C.T. an absolute divorce.

¶ 10    On 11 January 2021, the State Bar filed a complaint with the DHC against Defendant alleging Defendant violated the Rules by:

> (a) "making out" with C.T. at her home because he "perceived a mutual attraction[.]" Defendant attempted to engage in sexual relations with a current client in violation of Rule 8.4(a);
>
> (b) continuing to represent C.T. after they began a romantic relationship, Defendant represented a client

under circumstances where his ability to represent her could be materially limited by his personal interests in violation of Rule 1.7(a)(2);

(c) engaging in a sexual relationship with his current client[ in violation of] Rule 1.19(a); and

(d) falsely telling C.T. that his wife had threatened to sue her for alienation of affection, Defendant engaged in conduct involving dishonesty, deceit, or misrepresentation in violation of Rule 8.4(c).

The complaint sought disciplinary action against Defendant in accordance with N.C. Gen. Stat. § 84-28. On 10 February 2021, Defendant filed a *pro se* answer to the State Bar's complaint.

¶ 11 On 23 August 2021, the matter was heard before a three-member DHC panel, pursuant to N.C. Gen. Stat. § 84-28.1(b). Defendant was represented by counsel at the hearing. On 21 September 2021, the DHC entered its written Order, in which it made the following findings of fact by clear, cogent, and convincing evidence in the adjudication phase:

(1) Plaintiff, the North Carolina State Bar, is a body duly organized under the laws of North Carolina and is the proper party to bring this proceeding under the authority granted it in Chapter 84 of the General Statutes of North Carolina, and the Rules and Regulations of the North Carolina State Bar (Chapter 1 of Title 27 of the North Carolina Administrative Code).

(2) Defendant, Lonnie P. Merritt, was admitted to the North Carolina State Bar in August 2008, and is, and was at all times referred to herein, an attorney at law licensed to practice in North Carolina, subject to the

laws of the State of North Carolina, the Rules and Regulations of the North Carolina State Bar and the Rules of Professional Conduct.

(3) During all or part of the relevant periods referred to herein, Merritt was engaged in the practice of law in Wilmington, New Hanover County, North Carolina.

(4) Merritt was properly served with the summons and complaint in this matter.

(5) C.T. hired Merritt in March 2018 for representation in her domestic case.

(6) On Saturday 4 August 2018, Merritt went to C.T.'s home to have her sign a consent order regarding equitable distribution, alimony, child custody, and child support.

(7) After C.T. signed the document, Merritt perceived that there was a mutual attraction, so he asked permission to kiss C.T. and she said yes. When they broke away from "making out" C.T. stated they could not "go any further," so they did not have sexual intercourse that day.

(8) C.T'.'s spouse didn't sign the consent order until 8 August 2018, and it wasn't filed until 23 [sic] August 2018.

(9) After their interaction on 4 August 2018, Merritt and C.T. began a romantic relationship that included lengthy late-night phone calls.

(10) In mid-September 2018, Hurricane Florence hit the Wilmington area. After the storm, Merritt stayed with C.T. at C.T.'s mother's house for two days. Merritt then stayed with C.T. at her home for several more days. Merritt and C.T. began having sex.

(11) Merritt filed a complaint for absolute divorce on

C.T.'s behalf on 26 September 2018 and continued to represent C.T. until her divorce was finalized in November 2018.

¶ 12    Based on these findings of fact, the DHC then made the following conclusions of law in the adjudication phase:

> (1) All parties are properly before the Hearing Panel and this tribunal has jurisdiction over Defendant, Lonnie P. Merritt, and the subject matter of this proceeding.
>
> (2) Defendant's conduct, as set out in the Findings of Fact above, constitutes grounds for discipline pursuant to N.C. Gen. Stat. § 84-28(b)(2) in that Merritt violated the Rules of Professional Conduct in effect at the time of his conduct as follows:
>
>> (a) By "making out" with C.T. at her home because he "perceived a mutual attraction," Defendant attempted to engage in sexual relations with a current client in violation of Rule 8.4(a); and
>>
>> (b) By engaging in a sexual relationship with his current client, Defendant violated Rule 1.19(a).

¶ 13    Finally, the DHC made additional findings of fact and conclusions of law regarding discipline in the dispositional phase.  Based on all findings of fact and conclusions of law made by the DHC, it entered its order of discipline, suspending Defendant's license to practice law in the State of North Carolina for one year.

¶ 14    On 19 October 2021, Defendant filed timely written notice of appeal from the Order.

## II.    Jurisdiction

This Court has jurisdiction to address Defendant's appeal from a final order of the DHC. N.C. Gen. Stat. § 84-28(h) (2021).

### III. Issues

The issues before this Court are whether the DHC: (1) erred in concluding Defendant attempted to engage in sexual relations with his current client C.T. by "making out" with her after he "perceived a mutual attraction"; (2) erred in concluding C.T. was a current client when Defendant and C.T. engaged in sexual relations; (3) erred in finding that Defendant had inadequate boundaries between his professional and personal relationships; (4) erred in finding that Defendant chose to undermine the fiduciary relationship he shared with C.T., intentionally causing harm to C.T. and the profession; (5) erred in concluding the factors of "selfish motive" and "pattern of misconduct" are present in Defendant's case; and (6) abused its discretion in suspending Defendant from the practice of law for one year.

### IV. Standard of Review

This Court reviews decisions of the DHC using the "whole record" test, "which requires the reviewing court to determine if the DHC's findings of fact are supported by substantial evidence in view of the whole record, and whether such findings of fact support its conclusions of law." *N.C. State Bar v. Leonard*, 178 N.C. App. 432, 437, 632 S.E.2d 183, 187 (2006) (citation and quotation mark omitted); *see also* N.C. Gen. Stat. § 150B-51(5) (2021). "The evidence is substantial if, when considered as a whole,

it is such that a reasonable person might accept as adequate to support a conclusion." *N.C. State Bar v. DuMont*, 304 N.C. 627, 643, 286 S.E.2d 89, 99 (1982) (citation omitted). Moreover, the evidence "must rise to the standard of 'clear[, cogent,] and convincing.'" *N.C. State Bar v. Talford*, 356 N.C. 626, 632, 576 S.E.2d 305, 310 (2003) (citation omitted). "[U]nchallenged findings of fact[ ] are binding on appeal." *N.C. State Bar v. Key*, 189 N.C. App. 80, 87, 658 S.E.2d 493, 498 (2008) (citation omitted).

> After reviewing the whole record, this Court must determine whether the DHC's decision has a rational basis in the evidence. [T]he following steps are necessary as a means to decide if a lower body's decision has a "rational basis in the evidence": (1) Is there adequate evidence to support the order's expressed finding(s) of fact? (2) Do the order's expressed finding(s) of fact adequately support the order's subsequent conclusion(s) of law? and (3) Do the expressed findings and/or conclusions adequately support the lower body's ultimate decision? We note, too, that in cases such as the one at issue, e.g., those involving an "adjudicatory phase" (Did the defendant commit the offense or misconduct?), and a "dispositional phase" (What is the appropriate sanction for committing the offense or misconduct?), the whole-record test must be applied separately to each of the two phases.

*N.C. State Bar v. Ethridge*, 188 N.C. App. 653, 658–59, 657 S.E.2d 378, 382 (2008) (citation and quotation marks omitted).

¶ 18        "The whole-record test also mandates that the reviewing court must take into account any contradictory evidence or evidence from which conflicting inferences may be drawn." *Id.* at 660, 657 S.E.2d at 383 (citation omitted). However, "[t]he whole

record test does not allow the reviewing court to replace the [DHC's] judgment as between two reasonably conflicting views, even though the court could justifiably have reached a different result had the matter been before it *de novo*." *N.C. State Bar v. Nelson*, 107 N.C. App. 543, 550, 421 S.E.2d 163, 166 (1992).

## V. Analysis

### A. Challenges to the Adjudication Phase

#### 1. Conclusion of Law 2(a)

¶ 19        In his first argument, Defendant contends conclusion of law 2(a) is not supported by findings or substantial evidence. Defendant further contends "the word 'attempt' . . . is generally found within the context of criminal actions," and "[a]ttempt offenses are not listed in the [Rules]." The State Bar argues conclusion of law 2(a) is fully supported by Defendant's stipulations and the undisputed evidence.

¶ 20        Rule 8.4 provides "[i]t is professional misconduct for a lawyer to . . . violate or attempt to violate the Rules of Professional Conduct . . . ." N.C. R. Pro. Conduct 8.4(a). Thus, under the Rules, professional misconduct occurs, *inter alia*, when there is an attempt to violate *any* other rule of professional conduct. *See* N.C. R. Pro. Conduct 8.4(a). Rule 1.19 prohibits a lawyer from "hav[ing] sexual relations with a current client of the lawyer" unless "a consensual sexual relationship existed between the lawyer and the client before the legal representation commenced." N.C. R. Pro. Conduct 1.19(a)–(b). "Sexual relations" is defined as "(1) [s]exual intercourse; or (2)

[a]ny touching of the sexual or other intimate parts of a person or causing such person to touch the sexual or other intimate parts of the lawyer for the purpose of arousing or gratifying the sexual desire of either party." N.C. R. Pro. Conduct 1.19(d).

This Court has applied the elements of criminal attempt to an attorney disciplinary action notwithstanding its acknowledgment that the Rules do not contain such a requirement. *See N.C. State Bar v. Livingston*, 257 N.C. App. 121, 129, 809 S.E.2d 183, 189–90 (2017), *disc. rev. denied*, 371 N.C. 112, 812 S.E.2d 853 (2018). The elements for common law criminal attempt are: "(1) the intent to commit the substantive offense, and (2) an overt act done for that purpose which goes beyond mere preparation, but (3) falls short of the completed offense." *Id.* at 129, 809 S.E.2d at 189–90 (quoting *State v. Coble*, 251 N.C. 448, 449, 527 S.E.2d 45, 46 (2000)). "Intent is a mental attitude so it must ordinarily be proven by circumstances from which it can be *inferred.*" *State v. English*, 241 N.C. App. 98, 106, 772 S.E.2d 740, 746 (citation and quotation marks omitted), *disc. rev. denied*, 368 N.C. 287, 776 S.E.2d 201 (2015).

Here, it can be reasonably inferred from the findings of fact, and the underlying substantial circumstantial evidence supporting these findings, that Defendant attempted to have sexual relations with C.T. on 15 August 2018. *See id.* at 106, 772 S.E.2d at 746. Despite Defendant's testimony to the contrary, the substantial evidence of record, viewed as a whole, reveals Defendant intended to have sexual

relations with C.T. on 15 August 2018. Defendant's intent is evidenced by meeting C.T. inside her home on a Saturday and asking to kiss her. *See id.* at 106, 772 S.E.2d at 746; *Coble*, 251 N.C. at 449, 527 S.E.2d at 46. He performed the overt acts of kissing C.T., touching C.T.'s leg under her dress, and snapping C.T.'s undergarment against her body. *See Coble*, 251 N.C. at 449, 527 S.E.2d at 46. Finally, Defendant did not have sexual intercourse with C.T. because C.T. did not want to "go any further"; thus, Defendant's actions fell short of a completed rule violation. *See id.* at 449, 527 S.E.2d at 46. We conclude the findings show Defendant attempted to have sexual relations with C.T. on 15 August 2018, in violation of Rule 1.19(a). *See id.* at 449, 527 S.E.2d at 46; *Livingston*, 257 N.C. App. at 129, 809 S.E.2d at 189–90; *see also* N.C. R. Pro. Conduct 1.19(a).

¶ 23        Relying on *Romulus v. Romulus*, 215 N.C. App. 495, 715 S.E.2d 308 (2011) and citing a lower court's finding of fact in that case, Defendant argues "this Court [has] found kissing not to be 'sexual relations.'" Not only is this proposition inaccurate, the question of whether "kissing" constitutes "sexual relations" was not decided by the *Romulus* Court. Furthermore, *Romulus* did not concern whether an attorney had *attempted* to violate any rule of professional conduct. Rather, the pertinent issue was whether the plaintiff was barred from alimony pursuant to N.C. Gen. Stat. § 50-16.3A(a) for the "illicit sexual behavior" she was alleged to have engaged in during her marriage. *Id.* at 497, 715 S.E.2d at 310. This case is not applicable to the case

before us, and Defendant's argument is without merit.

¶ 24    Defendant argues "[t]here was no sexual contact or even the exchange of words to substantiate an allegation of an attempt to engage in sexual relations." We disagree. By Defendant's own admissions at the hearing, he "wouldn't have seen [C.T. on 15 August 2018 had he] not gone to the clinic. . . . [He] probably would've just met her at Starbucks or wherever on the following Monday . . . ." Following the clinic visit, C.T. told Defendant "[i]t would be nice to see you again." At that point, Defendant made the decision to go to C.T.'s house later that day, based on their "mutual attraction" he perceived and his feelings of "lonel[iness]."

¶ 25    Defendant testified to feeling C.T.'s Spanx undergarment, which he described as being "very high up and low on her legs." He "snapped [C.T.'s undergarment] on her side," and they laughed. Defendant then asked C.T. what the undergarment was, and she said, "[y]ou know, we can't--." Defendant further testified their consensual kiss "was not a chaste kiss," and "probably" involved tongue.

¶ 26    Finally, we consider the plain words of finding of fact 7, which provides: "[a]fter C.T. signed the [consent order], [Defendant] perceived that there was a mutual attraction, so he asked permission to kiss C.T. and she said yes. When they broke away from 'making out' C.T. stated they could not 'go any further,' so they did not have sexual intercourse that day."

¶ 27    The second sentence of finding of fact 7 contains two independent clauses, (1)

"[w]hen they broke away from 'making out' C.T. stated they could not 'go any further,'" and (2) "they did not have sexual intercourse that day." These two clauses are separated by the word "so," which acts as a coordinating conjunction. The Merriam-Webster Dictionary defines "so" when used as a conjunction, as "with the result that," or "for that reason." *So*, Merriam-Webster, https://www.merriam-webster.com/dictionary/so (last visited 9 Sept. 2022). Thus, this finding indicates C.T. made a statement they "could not 'go any further,'" and *for that reason* Defendant and C.T. did not have sexual intercourse on 15 August 2018.

¶ 28    In his *pro se* answer, Defendant admitted to the State Bar's averment, from which finding of fact 7 was taken verbatim. Defendant later stipulated and agreed to this fact as part of a pre-hearing conference with the State Bar. Defendant did not specifically challenge finding of fact 7 on appeal. Therefore, we conclude adjudicatory finding of fact 7 is undisputed, binding on appeal, and supports conclusion law of 2(a). *See Leonard*, 178 N.C. App. at 437, 632 S.E.2d at 187; *Key*, 189 N.C. App. at 87, 658 S.E.2d at 498.

### 2. Conclusion of Law 2(b)

¶ 29    Defendant asserts conclusion of law 2(b) is not supported by substantial evidence. Defendant further argues the DHC "erred in usurping authority to substantially modify [the Consent Order] to create an attorney-client relationship." In other words, Defendant argues the DHC's disregard of the provision of the Consent

Order, which allowed Defendant to withdraw as counsel for C.T., had the practical effect of substantively changing the terms of the Consent Order. Moreover, Defendant contends the DHC, by concluding C.T. was a current client when sexual relations between Defendant and C.T. commenced, "appli[ed] unpromulgated legislative rules . . . and violate[d] Defendant's due process rights." Finally, Defendant maintains he was not practicing law in representing C.T. in the divorce proceeding because the representation was "administrative in nature." The State Bar contends "[t]he attorney-client relationship between C.T. and Defendant began in or before March 2018 and did not conclude before the entry of C.T.'s divorce judgment in November 2018"; thus, their sexual relations occurred while C.T. was a current client. We agree with the State Bar.

¶ 30        As an initial matter, we reject Defendant's assertion he was not practicing law when he: signed C.T.'s divorce complaint, communicated to opposing counsel he would be filing the complaint, filed a motion for summary judgment, and represented C.T. at the hearing on the motion for summary judgment.

¶ 31        In North Carolina, the practice of law is defined as "performing any legal service for any other person, firm or corporation, with or without compensation . . . ." N.C. Gen. Stat. § 84-2.1(a) (2021). Defendant does not contend he was performing any acts that are explicitly excluded from the phrase "practice of law" under the statute. Certainly, Defendant was practicing law when he drafted and filed the

divorce complaint and summary judgment motion on behalf of C.T. and represented C.T. before the New Hanover County District Court on the motion. *See id.*

¶ 32 Conclusion of law 2(b) provides: "[b]y engaging in a sexual relationship with his current client, Defendant violated Rule 1.19(a)." We first consider whether the findings demonstrate an attorney-client relationship existed between C.T. and Defendant before their sexual relations commenced.

¶ 33 The existence of an attorney-client relationship "is a question of fact for the [fact-finder.]" *Cornelius v. Helms*, 120 N.C. App. 172, 175, 461 S.E.2d 338, 339 (1995). "[T]he relation of attorney and client may be implied from the conduct of the parties, and is not dependent on the payment of a fee, nor upon the execution of a formal contract." *N.C. State Bar. v. Sheffield*, 73 N.C. App. 349, 358, 326 S.E.2d 320, 325 (citation omitted), *writ denied*, 474 U.S. 981, 106 S. Ct. 385, 88 L. Ed. 2d 338 (1985). Whether an attorney-client relationship exists depends on whether the "relationship could reasonably be inferred" from the attorney's conduct. *Id.* at 358, 326 S.E.2d 325.

¶ 34 Defendant correctly identifies the duties of the DHC, as an administrative agency.

> [O]nce all the evidence has been presented and considered, to determine the weight and sufficiency of the evidence and the credibility of the witnesses, to draw inferences from the facts, and to appraise conflicting and circumstantial evidence. The credibility of witnesses and the probative value of particular testimony are for the administrative body to determine, and it may accept or reject in whole or

part the testimony of the any witness.

*Ethridge*, 188 N.C. App. at 665, 657 S.E.2d at 386.

¶ 35      In this case, the record reveals Defendant entered into the Initial Agreement with C.T. on 9 March 2018. This agreement included filing for an absolute divorce as a Covered Service of the representation. On 3 August 2018—one day before Defendant's interaction with C.T. at her house—Defendant and C.T. entered into the Second Agreement, which specifically excluded the filing for absolute divorce from the Covered Services. On 28 August 2018, the Consent Order was filed with the court, which *could* have terminated Defendant's representation under the Initial Agreement; however, the Initial Agreement could have also been terminated when Defendant provided the Covered Services, based on the plain words of the agreement. Defendant's handling of C.T.'s divorce, consistent with the terms of the Initial Agreement and without the execution of a separate agreement, demonstrates his representation under the Initial Agreement was not complete until he sought C.T.'s absolute divorce.

¶ 36      C.T. testified she did not remember signing the Second Agreement. Defendant testified that he had the Second Agreement executed for tax-related purposes, and he needed the agreement to prove his earned income. According to Defendant, the Second Agreement had the same fee and same covered services. Contrary to Defendant's contentions, neither the fees nor the covered services were the same

across the two agreements. The Second Agreement raised the fees by $600.00 and did not include filing for absolute divorce. Nevertheless, Defendant testified he did not intend to change the substantive terms of his Initial Agreement with C.T.; he only intended to create a duplicate agreement to provide to a third party. Defendant ultimately found the original Initial Agreement in his files. Lastly, despite Defendant's reference in his brief to the Second Agreement as a "superseding" agreement, the terms of the Second Agreement did not terminate the Initial Agreement or otherwise render the Initial Agreement void.

¶ 37 The DHC was presented with evidence of the two representation agreements, which it admitted, as well as other evidence, including testimony. From this evidence, the DHC "determine[d] the weight and sufficiency of the evidence and the credibility of the witnesses, . . . dr[e]w inferences from the facts, and . . . appraise[d] conflicting and circumstantial evidence." *See Ethridge*, 188 N.C. App. at 665, 657 S.E.2d at 386.

¶ 38 In this proceeding, "Defendant was given proper notice of the allegations against him; he was allowed access to the evidence supporting these allegations; he was permitted to call his own witnesses, introduce evidence, and cross-examine opposing witnesses; and he was able to file motions and make legal arguments." *See N.C. State Bar v. Sutton*, 250 N.C. App. 85, 95, 791 S.E.2d 881, 891 (2016) (rejecting the defendant's argument he was denied due process in his disciplinary proceeding),

*appeal dismissed*, 369 N.C. 534, 797 S.E.2d 296 (2017). Therefore, we are not persuaded by Defendant's argument that his due process rights were violated when the DHC made findings supported by the substantial evidence in view of the record, even if the evidence may have supported contrary findings. *See Nelson*, 107 N.C. App. at 550, 421 S.E.2d at 166; *see also Harding v. Bd. of Adjustment*, 170 N.C. App. 392, 398, 612 S.E.2d 431, 436 (2005) (explaining this Court cannot substitute its judgment for that of another administrative body even when "evidence in the record would have supported contrary findings and conclusions"). Additionally, we note Defendant did not challenge on appeal any findings of fact made during the adjudicatory phase; therefore, these findings are deemed supported by substantial evidence and "are binding on appeal." *See Key*, 189 N.C. App. at 87, 658 S.E.2d at 498.

¶ 39        The DHC did not make an explicit finding of fact that the attorney-client relationship existed between C.T. and Defendant from March 2018 and continued through November 2018; however, the findings show the representation began in March 2018, and Defendant "continued to represent C.T. until her divorce was finalized in November 2018." These findings were not contested on appeal and are therefore binding. *See Key*, 189 N.C. App. at 87, 658 S.E.2d at 498. Further, the DHC did not make a finding indicating the representation had terminated at any point in this time period, so we infer from these findings that the representation was continuous. Notwithstanding the formal representation agreements executed by C.T.

and Defendant, and the timing of the orders filed in C.T.'s domestic case, there is substantial evidence in view of the whole record, that an attorney-client relationship existed between Defendant and C.T. in March 2018 and continued after entry of the Consent Order. *See Sheffield*, 73 N.C. App. at 358, 326 S.E.2d at 325.

¶ 40        Specifically, on 6 August 2018, Defendant wrote an email to the attorney representing C.T.'s husband in the domestic dispute indicating, "I will tell [C.T.] I we [sic] will file for absolute divorce after we get a signed order on this other stuff." That same day, C.T. replied to Defendant's email, acknowledging she read Defendant's email to opposing counsel. Based on Defendant's statement that Defendant—or Defendant and C.T.—would file for C.T.'s absolute divorce, C.T. could reasonably infer an attorney-client relationship continued to exist between her and Defendant after she signed the Initial Agreement, and until the divorce judgment was entered. *See Sheffield*, 73 N.C. App. at 358, 326 S.E.2d at 325. Additionally, Defendant's statement that he would be filing for C.T.'s absolute divorce was consistent with the purpose for which C.T. originally sought his legal services as well as the terms of the Initial Agreement, which included absolute divorce within the scope of representation. No separate representation agreement was entered with respect to the service of filing for absolute divorce. Although Defendant argues the filed Consent Order *allowed* him to withdraw as counsel, there is no evidence he did in fact withdraw, and his actions demonstrate his continued representation of C.T. *See*

N.C. R. Pro. Conduct 1.16(d) ("Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client . . . ."). Hence, it can be reasonably inferred from DHC's findings that the attorney-client relationship was established in March 2018 and was ongoing until C.T.'s divorce judgment was entered on 2 November 2018.

¶ 41 Finding of fact 10, which is not challenged on appeal, states "[Defendant] and C.T. began having sex" in mid-September. Thus, this finding is "binding on appeal." *See Key*, 189 N.C. App. at 87, 658 S.E.2d at 498. As discussed above, the attorney-client relationship existed between March 2018 and 2 November 2018, when C.T.'s divorce judgment was entered. Therefore, the conclusion of law 2(b), which provides Defendant had sexual relations with a current client in violation of Rule 1.19(a), is supported by the unchallenged findings of fact. *See Leonard*, 178 N.C. App. at 437, 632 S.E.2d at 187.

**B. Challenges to the Dispositional Phase**

¶ 42 Defendant challenges two findings of fact made regarding discipline. He also challenges two conclusions of law regarding discipline relating to factors under 27 N.C. Admin. Code 1B.0116(f)(3) (2021). Finally, Defendant argues the DHC abused its discretion in ordering suspension.

¶ 43 "Suspension or disbarment is appropriate where there is evidence that the defendant's actions resulted in significant harm or potential significant harm to the

clients, the public, the administration of justice, or the legal profession, and lesser discipline is insufficient to adequately protect the public." 27 N.C. Admin. Code 1B.0116(f)(1) (2021). The DHC considers the following factors in imposing suspension:

> (A) intent of the defendant to cause the resulting harm or potential harm;
>
> (B) intent of the defendant to commit acts where the harm or potential harm is foreseeable;
>
> (C) circumstances reflecting the defendant's lack of honesty, trustworthiness, or integrity;
>
> (D) elevation of the defendant's own interest above that of the client;
>
> (E) negative impact of defendant's actions on client's or public's perception of the profession;
>
> (F) negative impact of the defendant's actions on the administration of justice;
>
> (G) impairment of the client's ability to achieve the goals of the representation;
>
> (H) effect of defendant's conduct on third parties;
>
> (I) acts of dishonesty, misrepresentation, deceit, or fabrication; [and]
>
> (J) multiple instances of failure to participate in the legal professional's self-regulation process.

27 N.C. Admin. Code 1B.0116(f)(1). In all disciplinary cases, the DHC considers certain factors, including *inter alia*, "dishonest or selfish motive," "a pattern of

misconduct," and "any other factors found to be pertinent to the consideration of the discipline to be imposed." 27 N.C. Admin. Code 1B.0116(f)(3)(C), (F), (V).

### 1. *Finding of Fact 3 regarding Discipline*

¶ 44        Defendant argues finding of fact 3 "is not substantially supported by competent evidence and unfairly attempts to cast a harsh light on Defendant despite Finding of Fact 2 confirming that Defendant has no prior professional discipline and Finding of Fact 6 stating that there is no indication of sexual relationships with other clients or a pattern of such misconduct." In support of his argument, Defendant points to his completion of a course addressing boundary concerns. We disagree.

¶ 45        Finding of fact 3 provides "Defendant's conduct demonstrates that he had inadequate boundaries between his professional and personal relationships." We note whether Defendant had prior professional discipline or sexual relations with his clients is not dispositive as to whether Defendant "had inadequate boundaries between his professional and personal relationships." There was substantial evidence in the record of Defendant's "inadequate boundaries," including: (1) Defendant meeting C.T. on a Saturday—after business hours—in the health clinic where she worked for Defendant to obtain unauthorized services; (2) Defendant meeting C.T. inside her home when his usual practice was meeting his clients in a public place; (3) Defendant acting on his feelings of attraction toward his current client; (4) Defendant asking C.T. if he could kiss her while she was his current client;

(5) Defendant having lengthy late-night phone calls with C.T. while she was his client; and (6) Defendant beginning a sexual relationship with C.T. while his conduct and actions inferred an attorney-client relationship existed.

¶ 46      Regarding Defendant's completion of a course, the record indicates Defendant completed a one-and-a-half-credit continuing legal education ("CLE") course entitled "The High Cost of Exercising Poor Professional Judgment" on 30 July 2021, approximately three weeks before the DHC hearing. The completion of said course roughly three years after the incidents in question is irrelevant to the DHC's disciplinary findings as to his conduct in 2018. Moreover, Defendant raises in his brief that "[c]oncerns about boundary issues for a kiss [were] not addressed within the context" of the CLE course he completed, which undermines his argument that completion of the course eliminated DHC's concerns for Defendant's blurred boundaries between professional and personal relationships. For the above reasons, finding of fact 3 is "supported by substantial evidence in view of the whole record." *See Leonard*, 178 N.C. App. at 437, 632 S.E.2d at 187.

### 2. *Finding of Fact 4 regarding Discipline*

¶ 47      Defendant contests finding of fact 4 on the basis there was no fiduciary relationship between him and C.T. when they began an intimate relationship, and "[n]o evidence supports a finding that an attorney-client relationship existed" at that time. Defendant also asserts he did not intend to cause C.T. harm, and there is no

evidence the State Bar determined that his trust account contained funds received from C.T.

¶ 48     Finding of fact 4 provides "[a]t the time Defendant began an intimate relationship with C.T., it was foreseeable that his actions would undermine the fiduciary relationship that he shared with her. By choosing to undermine the fiduciary attorney-client relationship, Defendant intentionally caused harm to the client and the profession."

¶ 49     It is well-established "[t]he relationship between attorney and client is a fiduciary relationship." *Booher v. Frue*, 98 N.C. App. 585, 587, 392 S.E.2d 105, 106 (1990), *disc. rev. denied*, 328 N.C. 89, 402 S.E.2d 410 (1991). As stated above, an attorney-client relationship may exist even when no fees are received from a client; thus, any funds received by a client held in trust are unrelated to the inquiry of whether a fiduciary relationship exists with that client. *See Sheffield*, 73 N.C. App. at 358, 326 S.E.2d at 325. "[A] fiduciary relationship is generally described as arising when there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Dallaire v. Bank of Am., N.A.*, 367 N.C. 363, 367, 760 S.E.2d 263, 266 (2014) (citations and quotations omitted).

¶ 50     As discussed in Sections A(1) and A(2) above, Defendant intended to engage, and did engage, in sexual relations with C.T. after establishing an attorney-client

relationship, and therefore a fiduciary relationship. *See Booher*, 98 N.C. App. at 587, 392 S.E.2d at 106. The factor under 27 N.C. Admin. Code 1B.0116(f)(1) at issue in this finding concerns whether Defendant "intended to cause the resulting harm or potential harm." *See* 27 N.C. Admin. Code 1B.0116(f)(1)(A). Accordingly, we turn to the question of whether Defendant intended to cause harm to C.T. and the profession.

¶ 51        The issue of whether an inherent conflict of interest exists when an attorney engages in sexual relations with his or her divorce client has not been decided in North Carolina, and we need not decide it here. Nonetheless, we note other jurisdictions have concluded that when an attorney engages in consensual sexual relations with a divorce client where child custody, child support, alimony, and division of marital asserts are to be decided, there is a *per se* violation of the rules of professional conduct. *In re DiPippo*, 678 A.2d 454, 456 (R.I. 1996) (concluding it is impermissible for an attorney "to engage in sexual relations with a divorce client when issues of child custody, support, and distribution of marital assets are at stake . . . ."); *In re Lewis*, 262 Ga. 37, 38, 415 S.E.2d 173, 175 (1992) ("Every lawyer must know that an extramarital relationship can jeopardize every aspect of a client's matrimonial case . . . ."); *Att'y Grievance Comm'n v. Culver*, 381 Md. 241, 274, 849 A.2d 423, 443 (2002) (explaining an attorney who engages in consensual sexual relations with a domestic relations client has an inherent conflict of interest when divorce, child custody, and alimony, or distribution of marital assets are at issue).

The reasoning for this bright-line rule is such a relationship may: (1) affect the client's ability to secure child custody, alimony, and attorney's fees; (2) create a conflict of interest; (3) impact marital property distribution; (4) interfere with the client's ability to reconcile with his or her spouse; (5) jeopardize the client's rights; or (6) prevent the attorney from exercising independent judgment. *See In re DiPippo*, 678 A.2d at 456; *In re Lewis*, 262 Ga. at 38, 415 S.E.2d at 175; *Att'y Grievance Comm'n v. Culver*, 381 Md. At 274, 849 A.2d at 443.

A divorce client in North Carolina who engages in a sexual relationship with his or her attorney faces similar dangers. *See, e.g.,* N.C. Gen. Stat. § 60-16.3A(a) (2021) (prohibiting a dependent spouse from being awarded alimony where "the dependent spouse participated in an act of illicit sexual behavior"); N.C. Gen. Stat. § 50-16.4 (2021) (allowing a court to enter an order for reasonable attorney's fees where a dependent spouse is entitled to alimony); *Darden v. Darden*, 20 N.C. App. 433, 435, 201 S.E.2d 538, 539 (1974) (explaining that evidence of adultery is relevant to the inquiry of a parent's fitness for being awarded custody of minor children); *Sebastian v. Kluttz*, 6 N.C. App. 201, 207, 209, 170 S.E.2d 104, 107–09 (1969) (explaining two torts arising from adultery: alienation of affection and criminal conversation). Further, comments to Rule 1.19, prohibiting sexual relations with a client, explain:

> (2) [t]he relationship [between an attorney and a client is] inherently unequal. The client comes to a lawyer with a problem and puts his or her faith in the lawyer's special

knowledge, skills, and ability to solve the client's problem. The same factors that lead the client to place his or her trust and reliance in the lawyer also have the potential to place the lawyer in a position of dominance and the client in a position of vulnerability.

(3) A sexual relationship between a lawyer and a client may involve unfair exploitation of the lawyer's fiduciary position. Because of the dependence that so often characterizes the attorney-client relationship, there is a significant possibility that a sexual relationship with a client resulted from the exploitation of the lawyer's dominant position and influence. Moreover, if a lawyer permits the otherwise benign and even recommended client reliance and trust to become the catalyst for a sexual relationship with a client, the lawyer violates one of the most basic ethical obligations, i.e., not to use the trust of the client to the client's disadvantage. This same principle underlies the rules prohibiting the use of client confidences to the disadvantage of the client and the rules that seek to ensure that lawyers do not take financial advantage of their clients.

. . . .

(4) A sexual relationship also creates the risk that the lawyer will be subject to a conflict of interest.

N.C. R. Pro. Conduct 1.19 cmt. n.2–4. It follows, a sexual relationship between an attorney and his or her divorce client may cause, or threaten to cause, significant harm to the client and the profession alike.

¶ 53    The potential harm inherent in a consensual sexual relationship between an attorney and a client, whom the attorney represents in family law matters, is present in the instant case where Defendant was representing C.T in divorce, alimony,

equitable distribution, child support, and child custody matters while he began an extramarital affair with her. The significant harm was foreseeable to Defendant, a family law attorney who had been licensed in North Carolina for approximately ten years when he began an affair with C.T. The DHC found C.T. to be "especially vulnerable" considering she was facing divorce and experiencing "significant turmoil" associated with her new single-parent status. Thus, the significant harm to C.T. was not merely financial harm, but emotional harm.

¶ 54        There were also allegations that Defendant's wife threatened to bring a claim against C.T. for alienation of affection. To limit harm to C.T., Defendant presented his wife with a settlement agreement, which waived Defendant's and his wife's rights to bring third-party claims, including claims for alienation of affection. Although Defendant and his wife executed the settlement agreement, Defendant's relationship with C.T. had the potential of causing significant financial harm to C.T. as her relationship with Defendant exposed her to the risk of liability from a third party.

¶ 55        Furthermore, C.T. sought advice from independent legal counsel regarding potential malpractice claims relating to the Consent Order Defendant negotiated just prior to attempting to have sexual relations with C.T. C.T. testified the Consent Order was not in her best interest because it did not allow her to claim both of her children on her tax returns and did not provide adequate child support. We do not foreclose the possibility Defendant's professional judgment in finalizing the Consent

Order may have been impaired, as evidenced by his desire to immediately kiss C.T. after she and Defendant signed it.

¶ 56 Defendant argues on appeal DHC "ignore[d] the evidence that C.T. engaged the services of an attorney to extort $14,000 from Defendant of which he paid an amount." The record shows Defendant agreed to settle with C.T., and Defendant provides no evidence of extortion. We do not believe the DHC ignored the evidence relating to C.T. and Defendant's settlement; rather, the DHC properly considered the evidence and the duties owed by Defendant to C.T. as her fiduciary, and concluded Defendant intended to cause the resulting harm to C.T. and the profession by engaging in deliberate, unethical conduct with a vulnerable client in contravention of a fiduciary relationship and Rule 1.19(a). Therefore, we conclude finding of fact 4 regarding discipline is "supported by substantial evidence in view of the whole record." *See Leonard*, 178 N.C. App. at 437, 632 S.E.2d at 187.

### 3. *Challenged Conclusions of Law regarding Discipline & Suspension*

¶ 57 In his final arguments, Defendant challenges two conclusions of law regarding discipline and contends the DHC abused its discretion in suspending him from the practice of law for one year.

¶ 58 We review the DHC's imposition of sanctions for an abuse of discretion. *Nelson*, 107 N.C. App. at 552, 421 S.E.2d at 167. "[S]o long as the punishment imposed is within the limits allowed by the statute[,] this Court does not have the

authority to modify or change it." *N.C. State Bar v. Wilson*, 74 N.C. App. 777, 784, 330 S.E.2d 280, 284 (1985) (citation omitted); *see also* N.C. Gen. Stat. § 84-28(h) ("Review by the appellate division shall be upon matters of law or legal inference."). Under N.C. Gen. Stat. § 84-28, "[m]isconduct by any attorney" is grounds for "[s]uspension for a period up to but not exceeding five years . . . ." N.C. Gen. Stat. § 84-28(c)(2) (2021).

> The DHC must support its punishment choice with written findings that are consistent with the statutory scheme of N.C. Gen. Stat. § 84-28(c). The order must also include adequate and specific findings that address how the punishment choice (1) is supported by the particular set of factual circumstances and (2) effectively provides protections for the public.

*N.C. State Bar v. Adams*, 239 N.C. App. 489, 495–96, 769 S.E.2d 406, 411 (2015) (citations omitted); *see also* N.C. Gen. Stat. § 84-28(c).

¶ 59 Defendant reiterates his arguments as to the adjudicatory findings of fact and conclusions of law. He also challenges portions of conclusion of law 4 regarding discipline.

¶ 60 Conclusion of law 4 provides:

> The Hearing Panel concludes that the following factors from § .0116(f)(3), which are to be considered in all cases, are present in this case:
>
> (a) the absence of prior disciplinary offenses in this state or any other jurisdiction;

(b) selfish motive;

(c) a pattern of misconduct;

(d) vulnerability of victim; and

(e) degree of experience in the practice of law.

¶ 61        Defendant argues the factor of "selfish motive" was inappropriate because no sexual relationship existed with a current client. As explained above, this argument is unconvincing. Defendant also challenges the factor of "a pattern of misconduct" as being unsupported by the evidence. Assuming *arguendo* this factor is not supported by the evidence, Defendant has failed to show the DHC's decision would have been different had this factor not been found. Thus, Defendant has failed to show prejudicial error. *See N.C. State Bar v. Frazier*, 62 N.C. App. 172, 180, 302 S.E.2d 648, 654 (1983) (concluding the defendant failed to show prejudicial error in arguing his due process rights were violated in the hearing before the DHC).

¶ 62        Here, the DHC made findings of fact stating how Defendant's conduct was inconsistent with his role as fiduciary and caused harm to C.T. and the profession. It then considered admonition, reprimand, and censure but found these sanctions "would not be sufficient discipline because of the gravity of the harm to the administration of justice and the potential harm to the public and the profession in the present case." The DHC concluded "[e]ntry of an order imposing less serious discipline would fail to acknowledge the seriousness of the offenses Defendant

committed and would send the wrong message to attorneys and to the public regarding the conduct expected of members of the Bar in this state." Additionally, the DHC made findings consistent with the factors set out in 27 N.C. Admin. Code 1B.0116(f) to support the imposition of suspension: (1) an "intent of the defendant to cause the resulting harm or potential harm"; and (2) an "elevation of the defendant's own interest above that of the client." Thus, the Order adequately shows that Defendant's punishment is supported by the factual circumstances of the case and that the public will be protected from Defendant's conduct. *See Adams*, 239 N.C. App. at 495–96, 769 S.E.2d at 411.

¶ 63     Although Defendant does not raise the issue in his brief, we acknowledge the DHC did not make specific findings stating Defendant's conduct caused "*significant* harm," as required by the Administrative Code for the imposition of suspension. *See* 27 N.C. Admin. Code 1B.0116(f)(1); *see also Talford*, 356 N.C. at 637, 576 S.E.2d at 313 ("[F]indings must be made explaining how the misconduct caused significant harm or threatened significant harm, and why the suspension of the offending attorney's license is necessary in order to protect the public."). Nonetheless, we conclude implicit in the DHC's conclusion that Defendant violated Rules 8.4(a) and 1.19(a) is a determination that his misconduct presented "significant harm" to C.T. and the profession. *See Leonard*, 178 N.C. App. at 446, 632 S.E.2d at 191 (affirming the DHC's disbarment of the defendant and concluding the DHC implicitly found that

the defendant posed a significant potential harm to clients and the profession where his violation of the Rules of Professional Conduct constituted misconduct).

Therefore, we hold there was substantial evidence to support the findings in the DHC's order of discipline, and these findings support the conclusions of law. *See Ethridge*, 188 N.C. App. at 658–59, 657 S.E.2d at 382. We find no abuse of discretion in the DHC's imposition of suspension as a disciplinary sanction. *See Nelson*, 107 N.C. App. at 552, 421 S.E.2d at 167.

## VI.    Conclusion

Our review under the whole record test reveals the DHC's findings of fact are adequately supported by substantial evidence, and these findings of fact support its conclusions of law that, *inter alia*, Defendant violated Rules 1.19(a) and 8.4(a). Together, the DHC's findings of fact and conclusions of law have a rational basis in evidence supporting the suspension of Defendant's license to practice law in North Carolina for one year.

AFFIRMED.

Judges DILLON and GORE concur.